**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** : | |
| : | |
| **Plaintiff,** : | |
| : | **Case No. 22-cv-2975** |
| **v.** : | |
| : | |
| **CHICAGO CRYPTO CAPITAL LLC, BRIAN B. AMOAH, DARCAS OLIVER YOUNG, and ELBERT G. ELLIOTT,** : | **Jury Trial Demanded** |
| : | |
| **Defendants.** : | |
| : | |

## COMPLAINT

Plaintiff U. S. Securities and Exchange Commission ("SEC") alleges as follows:

### Summary

1.     From approximately August 2018 through November 2019, Defendants Chicago Crypto Capital LLC ("CCC"), Brian B. Amoah, its president and sole owner, and two of its salesmen, Darcas Oliver Young and Elbert G. Elliott, conducted an unregistered offering of crypto asset securities called BXY, illegally raising at least $1.5 million in proceeds through unregistered offers and sales of these securities to approximately 100 individuals, many of whom had no experience investing in crypto assets.

2.     The BXY offering was not registered with the Commission and did not satisfy any exemption from registration.  Further, none of the Defendants were registered with the Commission as brokers, despite the fact that they each effected transactions in BXY for CCC customers' accounts, advised prospective investors about the merits of investing in BXY, and received transaction-based compensation.

3.      In addition, each of the Defendants knowingly, recklessly or negligently made materially false and misleading statements in the offer and sale of, and the purchase and sale of, BXY tokens.  More specifically, the Defendants misled investors about the custody and delivery of BXY, and made false and misleading statements about the markup charged by CCC, the delivery of account statements, CCC's liquidation of an investor's BXY, their personal investments in BXY, and the financial and management problems occurring at BXY's issuer, Beaxy Digital Ltd., in late 2019.  Each of these misstatements would be information a reasonable investor would want to know.

4.      By engaging in the conduct set forth in this Complaint, Defendants engaged in the unlawful offer and sale of securities in violation of Sections 5(a) and (c) of the Securities Act of 1933 (the "Securities Act"); acted as unregistered brokers in violation of Section 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act'); and committed fraud in violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

5.      The SEC seeks to enjoin each of the Defendants in this action from future violations of the federal securities laws, as well as from participating in any offering of crypto asset securities, and also seeks disgorgement of their ill-gotten gains, along with prejudgment interest and significant civil penalties.  The SEC also requests that the Court enter against Amoah an officer and director bar pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act.

**Jurisdiction and Venue**

6.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

7.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

8.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa, because the Defendants reside or transacted business in this district, and some of the acts, practices, and courses of business constituting the securities violations alleged herein occurred within this district.

**Defendants**

9.     **Chicago Crypto Capital LLC** ("CCC") is an Illinois limited liability company with its headquarters in Chicago, Illinois.  CCC sells crypto assets, including Bitcoin and Ether, and markets other blockchain-related investments.  CCC has never been registered with the SEC as a broker-dealer, nor has it ever registered or attempted to register any offering of securities under the Securities Act or any class of securities under the Exchange Act.

10.     **Brian Bartlett Amoah**, age 40, is a resident of Chicago.  From April 2017 to the present, Amoah has been the president and sole owner of CCC.  From 2015 until April 2017, Amoah was employed by Chicago Precious Metals Exchange LLC ("CPME"), a Chicago-based dealer of gold and silver.  From September 2007 until April 2009, Amoah was associated with a

commodities broker headquartered in Los Angeles, California.  Amoah has never been registered as a securities broker or associated with an SEC-registered broker-dealer.

11.    **Darcas Oliver Young**, age 57, is a resident of Chicago.  Young is the founder and sole employee of CPME.  CPME and CCC shared an office until approximately November 2021.  From approximately January 2018 until December 2021, Young assisted Amoah in the management of CCC.  From 2005 until 2010, Young was a representative of a commodities broker, and operated that broker's branch office in New York City.  In 2009, the National Futures Association ("NFA") filed a proceeding alleging that Young and other representatives of that broker made misleading statements to customers and recommended options trades designed to maximize commissions.  Young settled that proceeding without admitting or denying the allegations, was suspended for six months from association with an NFA member, and was ordered to pay a fine if he reapplied for membership.  Young has never been registered as a securities broker or associated with an SEC-registered broker-dealer.

12.    **Elbert "Al" Elliott**, age 65, is a resident of East Chicago, Indiana.  From February 2019 through approximately January 2020, Elliott sold crypto asset securities for CCC. Elliott has never been registered as a securities broker or associated with an SEC-registered broker-dealer.  In December 2005, Elliott was charged in the state of Indiana with forty-three counts of fraud, misappropriation and selling securities in an unregistered offering.  Elliott pleaded guilty to eight counts and served five years in prison as a result of the conviction.

### Related Entity

13.    **Beaxy Digital Ltd.** ("Beaxy") is a Saint Kitts and Nevis corporation with its principal place of business in Chicago, Illinois.  Beaxy operated a crypto asset trading platform known as the Beaxy Exchange until October 2019.

4

**Crypto Assets and Blockchain**

14.     The term "crypto asset" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens."

15.     A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.

16.     Digital tokens may be traded on crypto asset trading platforms in exchange for other crypto assets or fiat currency (legal tender issued by a country).

**Factual Allegations**

**A.      Amoah Founded CCC in 2017.**

17.     Prior to April 2017, Amoah was employed by CPME and worked with Young selling gold and silver investments.  During this time, Amoah began investing in crypto assets, and began purchasing crypto assets for friends, family and his precious metals customers.

18.     In April 2017, Amoah incorporated CCC and began selling crypto assets more regularly. Sometime in 2018, CCC began hiring salespeople to offer crypto assets to customers.

19.     At all relevant times, Amoah was CCC's sole owner and was the final decision-maker with regard to CCC's business.  CCC's website identified Young as a co-founder and managing partner.  But this was not true.  Young had no ownership interest and no formal employment relationship with CCC.

20.     Young had no formal title at CCC but performed a variety of tasks for the firm. These included procuring sales leads and contact information of would-be investors to be cold-

called, interviewing and hiring employees, training and supervising sales staff, and vetting potential legal counsel.

21.     In 2019, CCC paid Young $100,000 using funds which CCC collected from BXY investors.  Some of this amount was compensation from Young's sales of BXY and his referrals of BXY investors.

**B.      CCC Agreed to Sell BXY Tokens for Beaxy.**

22.     Beaxy was the developer of a web-based trading platform for crypto assets called the Beaxy Exchange (the "Exchange"), which planned to launch sometime in 2019.  To fund the development of the trading platform and related applications, Beaxy began selling a crypto asset security called BXY in approximately 2018.   BXY purchasers invested in a common enterprise with an expectation of profits derived from the efforts of others.

23.     Beaxy sold a portion of the BXY tokens directly to investors through a "private sale." Beaxy identified its so-called "private sale" investors through its founders' business relationships, public marketing and through the use of paid influencers.

24.     Because the Beaxy Exchange platform was still in development when Beaxy conducted those sales, investors purchased BXY with the understanding that they would receive BXY tokens in the future, once the trading platform was launched.

25.     As described in Beaxy's offering memoranda, white paper, and other marketing materials, Beaxy and its agents used the proceeds from sales of BXY to fund development of the Exchange, including hiring software developers and securing the infrastructure necessary to operate the Exchange.  Beaxy and its agents also used the funds for operations, marketing, customer support, and ongoing legal and regulatory compliance.

26.     Beaxy Digital reserved 40% of the tokens to the team, its advisors, and the reserve funds to enable it to operate for up to 2 years without making a profit.

27.     One of Beaxy's presentations to potential investors represented that initial coin offerings ("ICOs") of crypto asset trading platforms had been the most profitable ICOs in 2018 and that "exchanges are where the profits are."

28.      Beaxy's offering circular issued to purchasers referred to them as "investors," and stated that BXY tokens were "speculative."  The offering circular also stated that the risks to investing in BXY were inextricably linked to the success of Beaxy and the trading platform it sought to operate, including risks with the company's ability to attract market participants, operating losses, and lack of profitability, among other things.

29.     The circular further stated that "a significant portion of demand for Digital Assets is generated by investors seeking to profit from market volatility."

30.     In connection with Beaxy's private sale, CCC sold BXY to investors through an arrangement with Beaxy.  Around August 2018, Amoah entered into an arrangement with Beaxy on behalf of CCC to sell BXY tokens.  The companies agreed that CCC would sell BXY tokens to investors for up to $0.05 per token, but that CCC would pay Beaxy only $0.02 per token and retain the difference.

31.     CCC also was permitted to purchase tokens for its own account at the same price. CCC was not required to sell or purchase any specific quantity of tokens.  Instead, CCC's role was to sell BXY tokens to a large number of retail investors in order to increase the number of users of the Exchange—and generally to raise money for Beaxy.

**C.      CCC Offered and Sold BXY Tokens to Hundreds of Investors.**

32.      Beginning in 2018, CCC, Amoah and Young hired, trained and supervised a sales team, which included Elliott.  From approximately August 2018 through December 2019, CCC salespeople sold BXY tokens to at least 100 individuals, many of whom lacked experience investing in crypto assets, and who paid a total of at least $1.5 million for those tokens.

33.      CCC salespeople used a variety of methods to solicit investors, including cold-calling.  CCC encouraged its sales team to make up to 100 sales calls per day generated from leads and contact information that Amoah and Young purchased from third parties and reused from CPME's customer lists.

34.      CCC salespeople called thousands of potential investors from all over the U.S. Many of these individuals had little knowledge of, or experience with, crypto assets.

35.      CCC salespeople also used social media sites, such as Twitter, LinkedIn, and Discord, to advertise and promote its BXY offering.  One CCC salesperson instructed his hundreds of Twitter followers to "DM with your email if you'd like more information about how to purchase some BXY and you are not accredited."  Amoah typically reviewed such tweets before they were posted.

**D.      CCC Marketed BXY by Promoting Its Profit Potential.**

36.      Amoah supervised and approved the creation of sales scripts, which CCC provided to its salespeople.  These scripts touted the potential for investors to generate huge profits by investing in BXY through CCC.

37.      CCC's sales scripts compared BXY to tokens offered by other crypto asset trading platforms, and described BXY as an opportunity to "make the BIG MONEY."  CCC's scripts failed to discuss BXY's purported utility or ask whether investors planned to use the trading

platform. Indeed, BXY had no utility for many of CCC's investors, who had little or no experience with crypto assets and did not plan to use the Exchange.

38.     Certain CCC salespeople, with Amoah's approval, also created and distributed written materials touting BXY's profit potential. One such document, entitled "Beaxy Investment Analysis," described large returns purportedly generated by investors in crypto tokens issued by other trading platforms.

39.     Another CCC marketing document projected increases in the price of BXY based on the circulating supply of BXY and the number of users on the trading platform. These projections described BXY's purported utility, but only as a means to support the price of the token.  Amoah reviewed and approved these documents before they were distributed.

40.     Under Amoah's supervision and with his approval, CCC salespeople, including Elliott, emailed investors copies of the presentation and offering circular that Beaxy had created for investors.

**E.     CCC Sold BXY to Unaccredited and Inexperienced Crypto Investors.**

41.     Many of the individuals to whom CCC offered and sold BXY tokens were not accredited investors and had no experience purchasing or selling crypto assets.  One CCC salesperson testified that, based on conversations with Amoah and a Beaxy executive, Beaxy had retained CCC for the express purpose of selling to unaccredited investors.

42.     Defendants took no steps to ensure that the individuals to whom it sold BXY were accredited investors or had prior experience with crypto asset securities.  The Defendants failed to limit their offers or sales of BXY to individuals with a certain income or net worth.

43.     In fact, CCC salespeople were not required to ask prospective investors about their income, net worth or investment experience.  If a person agreed to purchase BXY, CCC

salespeople failed to collect any information about that investor's investment experience, objectives, net worth, or income.

44.     As a result, CCC salespeople, including Elliott, frequently sold BXY to investors who had only limited familiarity with crypto asset securities or had no prior experience investing in them.

45.     CCC and Amoah encouraged salespeople to use aggressive language and tactics in phone conversations with potential investors and trained them not to "take the first no for an answer."

46.     For example, one of Elliott's BXY customers was an older individual with no prior knowledge or experience with crypto assets.  That investor relied on Elliott to educate her about crypto assets.  However, Elliot himself had no personal experience investing in crypto assets, and failed to disclose this fact.

47.     This investor told Elliott that she needed to preserve her assets for retirement and could not afford to lose her investment.  However, Elliott assured the investor that BXY was a safe investment. After numerous telephone, text and email conversations, Elliott persuaded this investor to purchase a total of $47,000 in BXY tokens, which are essentially worthless today.

   **F.     CCC Received Undisclosed Compensation for Its BXY Sales.**

48.     In return for its solicitation efforts, CCC was compensated by virtue of a markup CCC charged of up to 150% on each BXY token it sold to investors.  From August 2018 until the Exchange launched in June 2019, at Amoah's direction, CCC typically charged its customers approximately $0.045 or $.05 per BXY.  On occasion, Amoah approved discounts as low as $0.035 for customers who purchased a large volume of BXY.

49.     In various sales-related communications, including sales scripts and oral communications, CCC salespeople told investors they were providing them with a discount from the $0.05 launching price of BXY on the Exchange.  CCC salespeople failed to inform investors that CCC actually acquired BXY tokens at a cost of $0.02, or about the markup that CCC was charging investors.

50.     After the Exchange launched, from June 12, 2019 through November 2019, CCC sold BXY tokens based on the price quoted on certain crypto asset trading platforms, plus a significant markup that CCC salespeople failed to explain or disclose.

51.      For example, on July 11, 2019, when the quoted closing price of BXY was $0.055 per token, Elliott sold $10,000 in BXY to the investor referenced in paragraphs 46–47 for $0.11 per token, which represented a markup of approximately 100%.  Elliott failed to disclose that this investor was paying approximately double when buying BXY from Elliott.

52.     CCC compensated its salespeople, including Elliott, by paying them a portion— typically 40%—of the markup CCC received on each BXY sale.  Amoah also encouraged CCC salespeople to take their compensation in BXY instead of cash.

53.     Although each of the Defendants knew CCC was collecting a substantial commission on each BXY sale, Defendants and other CCC salespeople failed to disclose this commission to investors.  To the contrary, the written materials which CCC salespeople created and sent to investors – and which Amoah reviewed and approved—said the price of BXY was $0.05 and that funds from the sale would be used by Beaxy "35% for R&D; 25% for legal costs; 15% for marketing; 15% for operations; and 10% for customer support."

54.     In reality, however, CCC and Amoah used proceeds CCC retained from the BXY offering to fund Amoah's personal expenses, including travel, dining, and, on at least one

occasion, to pay for Amoah's wedding flowers, as well as to compensate CCC's salespeople and purchase BXY for CCC's own account.

55.    CCC's written materials further suggested that the firm's opportunity for profit was based on its own investment in BXY:  "Capital Gains: Chicago Crypto Capital will hold its BXY until a sufficient level of volume has been attracted to the exchange . . . . [which] will increase its price. . . . we are looking closely for $25m - $250m in daily volume . . . before considering an exit."  These written materials were misleading because they failed to disclose CCC's main profit source—the markup of between approximately $0.015 and $0.03 per token that CCC charged on each BXY sale.

**G.    CCC and Amoah Failed to Deliver BXY Tokens.**

56.    Under the supervision of Amoah and Young, from approximately August 2018 through November 2019, CCC raised a total of at least $1.5 million from the offering of BXY tokens.

57.    Investors paid for the BXY tokens they purchased from CCC by personal check, credit card, or crypto assets, like Ether and Bitcoin. CCC pooled investors' funds and, after retaining its markup, transferred the funds to Beaxy, which used the funds as described above in paragraphs 25–26.

58.    However, because the bulk of the BXY offering occurred prior to the launch of the Exchange (and the minting of the BXY tokens), most CCC customers received an unwritten "IOU" for the tokens.  They paid first and were supposed to receive the BXY tokens later.

59.    In written materials and phone calls, CCC salespeople, at Amoah's direction, represented that once the Exchange launched and the BXY tokens were minted, BXY purchasers

had two options: (1) investors could have their tokens delivered to a private wallet, or (2) CCC could hold BXY tokens on the investors' behalf.

60.     In order to use the first option, investors had to create a digital wallet, which was a challenge for those CCC investors who had no prior experience with crypto asset securities. Defendants failed to assist all investors in creating a digital wallet, and failed to ensure that all investors had successfully created a wallet.

61.     For investors who chose the second option of having CCC hold their BXY tokens, CCC salespeople, including Elliott, represented that the firm would hold the tokens on the customer's behalf, keep them informed about movements in the price of BXY, and liquidate the investors' BXY holdings upon request.

62.     Approximately fifty investors requested that CCC hold tokens on their behalf. In addition, according to CCC's records, the firm did not record any delivery preference or digital wallet information for another approximately forty investors, meaning that CCC held BXY tokens for these investors as well.

63.     Regardless which of the two options CCC customers chose, Amoah was the only person at CCC who had access to the BXY tokens which CCC held on behalf of its customers. Accordingly, he was responsible for depositing the BXY tokens into the wallets of CCC's customers (for those who chose the first option) and tracking CCC's inventory of BXY tokens (for those who chose the second option).

64.     However, CCC and Amoah had no automated, or even reliable, process to track investors' elections about token delivery, or which investors had received their BXY tokens. Instead, CCC salespeople, at Amoah's direction, maintained a simple Google Drive spreadsheet that could be used for tracking such information.

13

65.     It was up to each salesperson to populate the spreadsheet and to confirm that their investors' orders were fulfilled.  Neither Amoah nor CCC conducted any review to ensure that the spreadsheet accurately reflected all investors' BXY orders and delivery instructions.

66.     In addition, the spreadsheet which CCC salespeople and Amoah maintained was missing critical information.  For various investors, the spreadsheet contained only nicknames and no contact information.

67.     For dozens of investors, the spreadsheet failed to indicate whether CCC was required to deliver the BXY tokens to a digital wallet or hold the tokens on behalf of the investors.   In many cases where the spreadsheet included details about an investor's election, it lacked a wallet address or, when an address was provided, failed to indicate whether or not the tokens had been delivered.

68.     As a result of these failings, when the Exchange launched on or about June 11, 2019 and the BXY tokens were minted, CCC and Amoah failed to deliver any tokens to at least a dozen investors who purchased BXY between August 2018 and November 2019.

69.     Several of these investors created their own private wallets, but CCC and Amoah never delivered the tokens to their wallets.  Other investors had instructed CCC to hold their tokens, but never heard from CCC after making a BXY purchase.

70.     Since 2019, certain investors have attempted, repeatedly, to contact Defendants, and in particular Amoah, to request delivery of their BXY tokens.  But Amoah either has failed to answer their requests, has falsely promised to look into their requests but failed to follow up, or has provided various excuses why he could not deliver the requested tokens.

71.     For example, in response to one investor's request for his BXY tokens, Amoah claimed he was too busy planning his wedding to deliver that investor's tokens.  In addition,

when another investor requested delivery of her purchased BXY tokens, Amoah sent that investor a document purporting to list sales of her BXY tokens for tax purposes.

72.     But this investor had never authorized such sales, much less received any proceeds from these purported sales.  The document sent by Amoah also contained false information about the prices this investor paid for BXY tokens.

73.     At all relevant times, Amoah knew, should have known, or was reckless in not knowing that CCC lacked a reliable process for ensuring the delivery of investors' BXY tokens and lacked a system to segregate and track BXY tokens CCC had promised to hold on behalf of its investors.

**H.     Young and Elliott Made False Statements to Investors About Account Information, Liquidations, and Personal BXY Investments.**

74.     Young and Elliot made numerous false or misleading statements to investors about what information CCC would provide about their BXY investment.  For example, Young told one investor that:  (a) CCC would send the investor periodic account statements; (b) CCC had an online portal through which he could view his account; and (c) CCC would liquidate the investment at his request.

75.     Based on Young's recommendation, the investor agreed to purchase 600,000 BXY tokens at $0.05 per token, for a total investment of $30,000.  Although Young knew that CCC would receive $18,000 in compensation from the sale, he failed to disclose CCC's markup to the investor.  Rather, the investor understood, based on his conversations with Young, that CCC would only profit from its own investment in BXY. In addition, CCC had no process for holding and segregating the investor's BXY tokens, had no plans to provide account statements, and had no online portal through which he could monitor his investment.

76.     Further, this investor made repeated requests between July and September 2019 that CCC liquidate his investment.  And Young responded with repeated statements that CCC would do so.  However, CCC and Young failed to liquidate the investment and have failed to provide that investor with either the proceeds from the purported liquidation or with custody of his BXY tokens.

77.     Instead, Amoah or Young sent that investor a data storage device that they claimed would enable the investor to access his BXY.  When the investor attempted to access the device, however, it did not contain any data.  Despite continued requests, Amoah and Young have, to date, failed to provide the investor with a replacement device or otherwise deliver the investor's BXY tokens.

78.     Young's and Amoah's false statements and omissions were material because the investor would not have purchased BXY from CCC if he had known about CCC's compensation, its inability to provide account information or statements, and its failure to liquidate the investor's BXY tokens as requested.

79.     Similarly, Elliott made statements to several BXY investors that were either false or highly misleading.  For example, in order to persuade customers to invest in BXY, Elliott claimed that he personally had invested in BXY, and so had members of his family.  These statements were false.  Neither Elliott nor any of his family members had purchased BXY when he made these statements, or later owned the amounts of BXY he claimed they owned.

80.     Elliott told another investor that he had another customer who had investments of at least $250,000 in BXY, and had expressed interest in making additional investments.  In reality, Elliott knew he had no customers who had purchased $250,000 in BXY.

81.     On another occasion, in July 2019, Elliott told an investor that BXY had "strong [price] support" and would not fall for a period of time.  However, Elliott admitted that he did not know what "support" meant, and the price of BXY experienced significant volatility in the weeks immediately after Elliott's statement.

82.     Elliott's misstatements and omissions were material to these investors because they would not have purchased BXY from CCC if they had known the truth about Elliott's lack of personal investment, that Elliott did not have a customer who invested $250,000, and that BXY did not actually have "price support."

**I.      CCC, Amoah, and Elliott All Made Material Misstatements about Beaxy's Condition After the Exchange's Launch.**

83.     Beaxy began to experience financial and operational problems almost as soon as the trading platform launched in June 2019.  After the launch, the volume of trading that CCC had projected for the Exchange failed to materialize.

84.     The volume on the trading platform reached approximately $1 million in the first few weeks following the launch.  However, by approximately mid-July, the quoted daily volume had settled between $15,000 and $220,000 and the price of BXY hovered between $0.05 and $0.06.

85.     Beginning around August 2019, CCC, Amoah, and Young had reason to be concerned about Beaxy's viability.  On or about August 12, 2019, a hacker stole $570,000 in Bitcoin and another crypto asset security from Beaxy.  Amoah and other CCC representatives learned about the breach and theft as it occurred.

86.     Several CCC salespeople had serious concerns about Beaxy as a result of the theft, and have testified that Amoah shared these concerns.  One salesperson viewed Beaxy's

response to the theft as "sheer incompetence," and testified that Amoah agreed with this assessment.

87.     Between approximately August 12 and September 1, 2019, the price of BXY dropped from $0.05 to $0.029.

88.     In September 2019, Amoah told several CCC employees that Beaxy needed additional capital and was looking for new management.  On or about October 1, 2019, Amoah, Young and another CCC salesperson attended a meeting with members of Beaxy's management and its largest investor.  In a follow-up email after the meeting, Beaxy's head of development wrote that Beaxy's "runway is shrinking by the day."

89.     Despite the deepening concerns about Beaxy's viability and the plummeting price of BXY tokens, Elliott and others at CCC continued offering and selling BXY to investors and making bold predictions about its profit potential.  Amoah instructed CCC's salespeople to disclose the hack and other problems at Beaxy only if they were asked.

90.     Amoah reviewed and approved of the delivery to CCC salespeople a CCC call script dated October 24, 2019. In this script, CCC salespeople were instructed to say that CCC had "confidential news . . . about an upgrade in management, . . . and, most importantly one of the top market makers in the world poised to enter the BXY exchange to generate the volume needed to drive prices higher."

91.     That script failed to disclose that Beaxy's "runway [wa]s shrinking by the day," that Beaxy had not finalized a deal with a new market maker, or that Beaxy had terminated its CEO following allegations of misconduct.

92.     On or about November 26, 2019, Elliott sold $4,000 in BXY tokens to an investor for $0.02 per token, which was approximately three times the quoted closing price of BXY on

that day—$0.0067. Elliott failed to inform the investor about the problems at Beaxy, failed to disclose this considerable markup, and falsely told the investor he expected BXY to generate huge returns.

93.     In an email to the investor, Elliott wrote, "I am looking for the Grand Slam, my friend." Far from a "Grand Slam," BXY tokens are currently trading at fractions of a penny per token—orders of magnitude less than what CCC's customers originally paid.

## Claims for Relief

### Count I
### Violations of Sections 5(a) and 5(c) of the Securities Act

94.     The SEC realleges and incorporates by reference the allegations in paragraphs 1 through 93 above.

95.     By engaging in the conduct described above, Defendants directly or indirectly: (a) made use of means or instrumentalities of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instrumentalities of transportation, securities as to which no registration statement was in effect; and (c) made use of means or instrumentalities of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

96.     By reason of the foregoing, Defendants violated Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c).

**Count II**
**Violations of Section 17(a) of the Securities Act**

97.     Paragraphs 1 through 93 are realleged and incorporated by reference as though fully set forth herein.

98.      By engaging in the conduct described in paragraphs 1 through 93 above, Defendants, in the offer and sale of securities, by the use of the means and instrumentalities of interstate commerce, directly or indirectly have: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

99.     Defendants intentionally, recklessly, or negligently engaged in the fraudulent conduct described above.

100.     By reason of the foregoing, Defendants violated Section 17(a)(1)-(3) of the Securities Act, 15 U.S.C. § 77q(a)(1)-(3).

**Count III**
**Violations of Section 15(a) of the Exchange Act**

101.     Paragraphs 1 through 93 are realleged and incorporated by reference as though fully set forth herein.

102.     By engaging in the conduct described in paragraphs 1 through 93 above, Defendants, acting as brokers engaged in the business of effecting securities transactions for the accounts of others, made use of the mails or means and instrumentalities of interstate commerce to affect transactions in, or induce or attempt to induce the purchase or sale of a security, without being registered with the SEC.

103.    By reason of the foregoing, Defendants violated Section 15(a) of the Exchange

Act, 15 U.S.C. § 78o(a).

### Count IV
### Violations of Section 10(b) of the Exchange Act,
### and Exchange Act Rule 10b-5(b)

104.    Paragraphs 1 through 93 are realleged and incorporated by reference as if fully set

forth herein.

105.    By engaging in the conduct described in paragraphs 1 through 93 above,

Defendants, in connection with the purchase and sale of securities, by the use of the means and

instrumentalities of interstate commerce and by the use of the mails, directly and indirectly made

untrue statements of material fact and omitted to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading.

106.    Defendants intentionally or recklessly engaged in the fraudulent conduct

described above.

107.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange

Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. 240.10b-5(b).

### Count V
### Violations of Section 10(b) of the Exchange Act,
### and Exchange Act Rule 10b-5(a) and (c)

108.    Paragraphs 1 through 93 are realleged and incorporated by reference as if fully set

forth herein.

109.    By engaging in the conduct described in paragraphs 1 through 93 above,

Defendants, in connection with the purchase and sale of securities, by the use of the means and

instrumentalities of interstate commerce and by the use of the mails, directly and indirectly used

and employed devices, schemes and artifices to defraud; and engaged in acts, practices and

courses of business which operated as a fraud and deceit upon purchasers of securities.

110.     Defendants intentionally or recklessly engaged in the fraudulent conduct described above.

111.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. 240.10b-5(b).

## Relief Requested

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein.

### II.

Issue a permanent injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 thereunder, 17 CFR § 240.10b-5, and Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

### III.

Issue a conduct-based injunction precluding each of the Defendants from "participating, directly or indirectly, including, but not limited to, through any entity controlled by [Defendant], in any offering of crypto asset securities; provided, however, that such injunction shall not

prevent [Defendant] from purchasing or selling any crypto asset security for [his] own personal account."

## IV.

Enter an Order requiring Defendants to disgorge the ill-gotten gains that they received, directly or indirectly, from the violations alleged herein, including prejudgment interest, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act, 15 U.S.C. §§ 78u(d)(5), (7).

## V.

Order Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VI.

Impose on Defendant Amoah an officer and director bar pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act.

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other relief as this Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a trial by jury.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**


By: */s/Robert M. Moye*_____
Robert M. Moye (moyer@sec.gov)
Peter Senechalle (senechallep@sec.gov)
Devlin N. Su (sude@sec.gov)
United States Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for Plaintiff, Securities and Exchange
Commission*